**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN ANGLIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 17-cv-04240 |
| v. | ) ) ) | Hon. Elaine E. Bucklo |
| NISSAN NORTH AMERICA, INC., a California corporation, and INFINITI OF LISLE, INC. an Illinois corporation | ) ) ) ) | |
| *Defendants*. | ) ) **)** | **JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff, John Anglin, by and through his attorneys, brings this civil action on behalf of himself and other consumers who purchased certain Infiniti brand vehicles from Defendants, Nissan North America, Inc. ("Nissan"), and Infiniti of Lisle, Inc. ("Dealership") (collectively "Defendants"), that suffered from a serious defect in the vehicles' paint, which has caused severe delamination and peeling of the paint and exposed the vehicles to rust and corrosion. Plaintiff, on behalf of himself and a class of similarly situated individuals, now seeks damages, restitution, and all other available relief for Defendants' wrongful conduct.

**NATURE OF THE ACTION**

1.      This case concerns Nissan's manufacturing and sale of its luxury line of Infiniti brand vehicles that had severely defective paint at the time of purchase. The paint defect on the vehicles at issue caused the paint to delaminate and peel, and as a result, also created a significant risk of corrosive damage to the underlying body panels of the vehicle. Defendants

failed to disclose that the defect existed at the time of sale and have since refused to repair the defective paint or any damage resulting from it.

2.      Like the other members of the putative Class, Plaintiff purchased an Infiniti vehicle with the paint defect.  After just five years of ownership Plaintiff observed significant paint peeling on his vehicle and contacted the Dealership and Nissan to correct the problem. However, consistent with Defendants' common practice for the defective vehicles at issue, Plaintiff was declined any relief, even though Defendants were aware of the problem through numerous other consumer complaints.

## JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction under 28 U.S.C. § 1332(d), because (i) at least one member of the putative class is a citizen of a state different from any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to the instant action.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Defendants transact business in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, as Plaintiff purchased his vehicle in this District.

## PARTIES

5.      Plaintiff John Anglin is a citizen and resident of the State of Illinois.

6.      Nissan is a California corporation with its principal place of business in Franklin, Tennessee.  Nissan is registered to do business in the State of Illinois.  Nissan designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles,

including the Class Vehicles (as hereinafter defined), throughout the United States, including in this District. Nissan is the warrantor and distributor and/or seller of the Class Vehicles in the United States.

7.       Infiniti of Lisle, Inc. is an Illinois corporation with its principal place of business in Lisle, Illinois. Infiniti of Lisle, Inc. is registered to do business in the State of Illinois. Infiniti of Lisle, Inc. markets and sells Infiniti brand vehicles in this District and is a warrantor of the Subclass Vehicles (as hereinafter defined).

## FACTUAL BACKGROUND

8.       Nissan's Infiniti brand is one of the most popular luxury vehicle brands in the United States. In a typical month, Nissan sells thousands of Infiniti vehicles. Nissan markets its Infiniti brand vehicles as "modern luxury" and claims that those who purchase an Infiniti vehicle receive "an unprecedented commitment to professionalism and customer service that is tailored to fit you and your individual needs."[1]

9.       Unlike tires, batteries, and engine oil, which need regular replacement, in modern vehicles, particularly luxury vehicles, automobile paint is expected to last the lifetime of the vehicle, such that, absent an accident, a vehicle owner reasonably would not expect to have to spend thousands of dollars to have their vehicle stripped and repainted during the ownership of the car. Properly applied paint in luxury vehicles should last at least 10–15 years.

10.       Nissan, however, has manufactured, marketed, distributed, and sold its Infiniti brand vehicles with defective paint, or paint application, that leaves vehicle owners with a

---

[1] A true and correct copy of Infiniti's 2011 promotional brochure for its QX line of vehicles is attached hereto as Exhibit A.

vehicle whose paint peels off, fades, and otherwise delaminates, making the vehicle's appearance unacceptable and exposes the body panels of the vehicle to rust and corrosion after an unreasonably short period of time.

11.     The circumstances causing Nissan's Infiniti brand vehicles to have their paint delaminate prematurely is attributable to a defect that existed at the time of the original factory paint application (when the vehicle was manufactured), and appears to be caused by an adhesion issue with the paint, which prevents the paint from properly adhering to the body of the vehicle.

12.     Due to its nature, however, the defect is a latent one that could not have reasonably been discovered by a consumer when purchasing the vehicle. Instead, consumers are first made aware of the paint defect only after the paint on their vehicles begins to delaminate, peel, or fade.

13.     This paint defect is present across multiple models of substantially similar Infiniti vehicles. The same type of paint that was used on Plaintiff's Infiniti QX56 was also used on other vehicle models and applied in the same way.

14.     The facility and equipment used to paint Plaintiff's vehicle was also used to paint several other Infiniti model vehicles.

15.     The vehicles painted in this facility were painted through the same method of paint application.

16.     The paint defect on Nissan's Infiniti brand vehicles is widespread—even a cursory Internet search reveals dozens of comments and complaints on Infiniti's Facebook page which detail consumers' common experiences with Infiniti's defective vehicle paint. For example, on September 30, 2016 "Debbie" posted the following message and accompanying

4

photographs on Infiniti's Facebook page:

Dear Infiniti - I just called and talked to someone in consumer affairs and they basically said that Infiniti would not consider helping with the repairing the paint in anyway as my car is out of warranty. Calling was a waste of my time. I explained that this is a major defect that is happening to several customers all with the same model and the same color paint and that's it's a rather severe and costly problem. It's not like the paint is fainting a little; it's literally peeling off down to the bare metal. I am shocked that Infintii is not more concerned about their brand reputation and with helping it's customers. I had one quote to repaint my car that was $10,000. I wish I could afford to pay for the paint job, but I can't, so I guess it I will just keep driving this eye-sore around as is. I already spent money to repair 3 big gapping paint holes on the back below the window. The roof is the worse - see attached and now there are several places peeling on the hood now too.



17.     Even more recently, yet another frustrated Infiniti owner, "Leah" posted the

following message and photograph on December 28, 2016:

> This is more than a defect! Also 2011 infinity.  Started peeling just a few weeks
> ago on the hood ad now almost all the paint is off.  I love my infinity but this is
> ridiculous that the dealer won't cover it.  For such an expensive luxury SUV,
> consumers should not have to just eat the cost of a new paint job when it is more
> than obvious there are many with the same problem.



18.    The posts quoted above are just a small sampling of the dozens of consumer

complaints on Infiniti's Facebook page.[2]  Furthermore, there are numerous other websites where

owners of Infiniti vehicles have voiced complaints about defective paint on their vehicles, with

---

[2] It should also be noted that the damage on Plaintiff's and other consumers' Infiniti vehicles often occurs in the same location on the vehicle (hood, roof, and tailgate), and is also particularly prevalent in vehicles with white paint.

the complaints posted over a span of multiple years, including complaints publicly posted prior to Plaintiff's purchase of his Infiniti vehicle.

19. Despite their knowledge, Nissan and the Dealership failed to make any disclosure about this paint defect to unsuspecting consumers purchasing the Infiniti brand vehicles, and have failed to provide any remedy to consumers whose vehicles have manifested the defect.

**FACTUAL ALLEGATIONS WITH RESPECT TO PLAINTIFF**

20. Nissan's promotional materials market its Infiniti brand vehicles as "modern luxury" and state that its Infiniti brand provides "an unprecedented commitment to professionalism and customer service that is tailored to fit you and your individual needs."

21. Plaintiff received Nissan's promotional brochure prior to purchasing his Infiniti vehicle, and when making the decision to purchase his vehicle Plaintiff relied on the representations in the promotional materials as well as the representations regarding the quality, luxury and reliability of Infiniti brand vehicles that were made in Infiniti's TV commercials. (Ex. A.)

22. Based on his belief that Nissan manufactures and sells aesthetically-pleasing and reliable vehicles, and based on Defendants' representations as to the "luxury" nature of the Infiniti vehicles, in July 2011 Plaintiff visited the Dealership and purchased a 2011 model year Infiniti QX56, with "Moonlight White" paint. The total cost of the vehicle was approximately $72,792.00.

23. Plaintiff paid such a high price for his Infiniti vehicle because it served not only as a means of transportation, but also because of its highly attractive appearance and the high-class status associated with the vehicle.

24.     Maintaining a luxurious and premium appearance for its entire reasonable lifespan is one of the ordinary purposes of a luxury vehicle such as the one purchased by Plaintiff.

25.     At the time of purchase, presumably confirming his understanding that Nissan's Infiniti brand produced very high-quality luxury vehicles, Plaintiff received a "Quality Inspection Certificate" from Nissan. The Quality Inspection Certificate was signed by an Infiniti Quality Assurance Engineer and stated, in part, "Every Infiniti is built to the highest quality standards, employing the most advanced production technologies. This commitment ensures world class performance and luxury in each Infiniti automobile."

26.     As is the case with all Infiniti brand vehicles, Plaintiff's vehicle came with several express warranties, including a 4-Year/60,000 Mile Basic Limited Warranty; a 6-Year/70,000 Mile Powertrain Limited Warranty; and a 7-Year/Unlimited Mileage Corrosion Limited Warranty.

27.     Plaintiff also purchased an additional "Infiniti Elite Extended Protection Plan" for $2,511.00. This warranty was to expire on July 15, 2017 or 87,731 miles.

28.     In August 2016, just five years after Plaintiff purchased his Infiniti vehicle, Plaintiff first discovered that the paint on his vehicle had begun to fade and peel and that the bare body panels of his vehicle were now exposed to the elements. As a result, large portions of Plaintiff's vehicle no longer had the beautiful "Moonlight White" paint that Plaintiff had specifically selected when purchasing the vehicle, and instead appeared dull, gray and unsightly.[3]

29.     After the paint on his vehicle began to peel and fade, and as it continued to deteriorate, in or about January 2017, Plaintiff contacted the Dealership where he purchased his

---

[3] A true and correct photo of Plaintiff's vehicle is attached hereto as Exhibit B.

vehicle and requested that they fix the defective paint. The Dealership, however, refused to accept any responsibility for the paint problems, refused to provide warranty coverage for these issues, and otherwise refused to offer any remedy or relief to Plaintiff. Instead, the Dealership recommended that Plaintiff contact Nissan's customer service department.

30.     After the Dealership denied Plaintiff any relief, Plaintiff contacted Nissan's Infiniti customer service department and explained that the paint on his vehicle was delaminating and peeling. Two weeks after Plaintiff's initial phone call to Nissan, Plaintiff received a call back from Nissan during which he was told that there was nothing Nissan could, or would do to remedy the issue.

31.     Critically, at the time that Plaintiff complained about the paint defect to the Dealership and Nissan in or about January of 2017, Nissan and its Infiniti brand dealers already knew, but did not disclose to Plaintiff or other buyers or lessees, that there was a latent defect or problem with the paint on many Infiniti vehicles that caused the same exact issue that Plaintiff was experiencing—paint peeling from the body panels of the vehicle and exposing the underlying body panels to corrosion. Nissan instead denied all responsibility for the defect and any resulting damage caused to Plaintiff's and the putative Class Members' vehicles.

32.     The paint peeling and delamination experienced by Plaintiff resulted in a significant decrease in the resale value of his vehicle. This decrease in vehicle value is greater than simply the cost of a new paint job because of the increased risk that the vehicle will need to undergo additional repairs to the body panels, which are exposed to sun and moisture, thereby increasing the likelihood that the body panels will suffer from rust and corrosion.

33.     The increased risk of rust and corrosion have also caused the vehicle to

10

experience an increased risk of a marked reduction in its safety. Because rust and corrosion significantly weaken the exterior body panels of the vehicle, should the vehicle experience a collision, the exterior shell/body of the vehicle is more fragile than originally manufactured and what Plaintiff bargained for.

34.     The paint on Plaintiff's vehicle, as well as other Infiniti brand vehicles purchased by consumers, did not conform to industry standards, particularly given the luxury status and relatively new age of the vehicle. The paint began to delaminate and peel little more than 5 years after Plaintiff purchased the vehicle.

35.     A basis of the bargain for Plaintiff's purchase of his Infiniti vehicle was that the vehicle's paint would last for the lifetime of the vehicle, and Plaintiff would not have purchased the vehicle, or would have paid significantly less for it, had he known that its paint would peel and leave the body panels of his vehicle exposed to rust and corrosion just five years after purchase.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff brings this action individually and on behalf of all similarly situated persons as the Court may determine to be appropriate for class certification treatment, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiff seeks to represent the following Class and Subclass:

> The Class: All Illinois residents who, within the applicable statute of limitations period, purchased a Nissan Infiniti brand vehicle with defective paint as shown by Nissan's records (collectively, the "Class Vehicles").

> The Subclass: All Illinois residents who, within the applicable statute of limitations period, purchased a Nissan Infiniti brand vehicle with defective paint

from Defendant Infiniti of Lisle, Inc. as shown by the Dealership's and Nissan's records (collectively, the "Subclass Vehicles").

37. Excluded from the Class and Subclass are Defendants, Defendants' officers and directors, those persons' immediate families, and the successors and predecessors of any such excluded person or entity.

38. Nissan manufactured thousands of vehicles with the paint defect during the relevant time period, and the Class is reasonably estimated to be in the thousands or tens of thousands such that joinder of all their members is impracticable. Nissan's 2012 annual investor report indicates that during fiscal year 2011 it sold over 1.4 million vehicles in North America alone. The precise number of members of the Class and Subclass is unknown to Plaintiff, but can be ascertained through Defendants' records.

39. There is a well-defined community of interest in the relevant questions of law and fact affecting the putative members of the Class and Subclass.

40. Common questions of law and fact predominate over any individual questions affecting the members of the Class and Subclass, including, but not limited to, the following:

(a) Whether Defendants manufactured, marketed, distributed, and/or sold the Class Vehicles and Subclass Vehicles with a latent paint defect;

(b) Whether Defendants warranted that the Class Vehicles and Subclass Vehicles would be free from the paint defect experienced by Plaintiff and the other Class and Subclass members;

(c) Whether Defendants breached any warranties or contracts with Plaintiff and the other Class members by manufacturing, marketing, distributing and/or selling Class Vehicles and Subclass Vehicles whose paint began to peel and/or delaminate before the end of the vehicles' lifetime;

(d) Whether Defendants failed to remedy the paint defect on the Class Vehicles and Subclass Vehicles;

12

(e)    Whether Plaintiff and the other Class and Subclass members are entitled to monetary and/or restitutionary and/or injunctive relief or other remedies, and, if so, the nature of such remedies.

41.    With respect to the putative Class and Subclass, Plaintiff's claims are typical of those of the absent Class and Subclass members. If brought and prosecuted individually, the claims of each member of the Class and Subclass would require proof of many of the same material and substantive facts and would rely upon the same remedial theories, seeking the same relief.

42.    Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and Subclass. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and Subclass, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class or Subclass.

43.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by individual members of the Class and Subclass would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the Class and Subclass. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class and Subclass.

44.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), in that common questions of law and fact predominate over any questions affecting only individual members of the Class and Subclass.

45.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

      a.      Individual claims by the members of the Class and Subclass would be impracticable, as the costs of pursuing such claims individually would exceed what any one Class member has at stake;

      b.      Individual members of the Class and Subclass are unlikely to have an interest in separately prosecuting and controlling any individual actions;

      c.      The concentration of litigation of these common claims in one forum will achieve efficiency and promote judicial economy; and

      d.      The proposed class action is manageable.

### COUNT I
**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* against Defendants Nissan and Dealership**
**(on behalf of Plaintiff and the proposed Class and Subclass)**

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     Plaintiff and the other members of the Class are "consumers" within the meaning of 15 U.S.C. § 2310(3).

48.     Defendants are "suppliers" and "warrantors" within the meanings of sections 15 U.S.C. § 2301(4)–(5).

49.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

50.     15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

51.     Plaintiff, as well as the other Class members, contracted with Defendant Nissan, through Defendant's agents, to purchase Class Vehicles, and paid significant consideration in the

14

form of the purchase price for the Class Vehicles.

52.     Plaintiff, as well as the other Subclass members, contracted with Defendant Nissan, through Dealership, to purchase Subclass Vehicles, and paid significant consideration in the form of the purchase price for the Subclass Vehicles.

53.     As a matter of law, each Class Vehicle came with an implied warranty of merchantability whereby each such vehicle is warranted by Nissan to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which they are used.

54.     As a matter of law, each Subclass Vehicle came with an implied warranty of merchantability whereby each such vehicle is warranted by Nissan and Dealership to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which they are used.

55.     However, Defendants breached this implied warranty of merchantability, as Plaintiff's vehicle, and the Class and Subclass Vehicles, are not fit for the ordinary purposes for which they are used and would not pass inspection as conforming goods within the trade because at the time they left the control of Nissan, and at the time of sale, they had defective paint which had the propensity to peel, discolor, and delaminate during the lifetime of the vehicle.

56.     Plaintiff has specifically informed Nissan and the Dealership about their breach of the implied warranty in respect to his Infiniti brand vehicle and has afforded them a reasonable time to cure their breach.  Furthermore, Defendants have been informed about the defective paint by numerous other putative Class members but nonetheless have failed to remedy the situation. Under the circumstances, any requirement for the other Class and Subclass members to afford

15

Defendants any additional reasonable opportunity to cure its breach of the implied warranty should be excused and deemed satisfied.

57.     Defendants' breach of warranty deprived Plaintiff and the other Class and Subclass members the benefit of their bargain, as the quality and durability of the vehicles' paint, and the appearance of the vehicles over their lifetime, was material to their decision to purchase the vehicle.  The vehicles effectively ceased being the cars they purchased, given the substantial and material alterations to the vehicles' appearance caused by the defective paint.

58.     As a proximate and foreseeable result of Defendants' breach, Plaintiff and the other members of the Class and Subclass have and or/will sustain damages and loss.  These damages include, but are not limited to: the loss of value of the vehicle as a result of the paint defect; paint peeling, fading and/or discoloration; expectation damages for Plaintiff and the Class and Subclass members because they did not obtain the benefit of the bargain they struck with Defendants; and any further damages that Plaintiff and the other Class and Subclass members have or will incur in order to remedy the paint problems with their vehicles.

59.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

**COUNT II**
**Breach of the Implied Warranty of Merchantability against**
**Defendants Nissan and Dealership**
**(on behalf of Plaintiff and the proposed Class and Subclass)**

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

16

61.     Plaintiff, as well as the other Class members, contracted with Nissan, through Defendant's agents, to purchase Class Vehicles, and paid significant consideration in the form of the purchase price for the Class Vehicles.

62.     Plaintiff, as well as the other Subclass members, contracted with Nissan, through Dealership, to purchase Subclass Vehicles, and paid significant consideration in the form of the purchase price for the Subclass Vehicles.

63.     As a matter of law, each Class Vehicle comes with an implied warranty of merchantability whereby each vehicle is warranted by Nissan to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which they are used.

64.     As a matter of law, each Subclass Vehicle came with an implied warranty of merchantability whereby each such vehicle is warranted by Nissan and Dealership to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which they are used.

65.     However, Nissan and the Dealership breached this implied warranty of merchantability as Plaintiff's vehicle, and the appearance of Class and Subclass Vehicles, are not fit for the ordinary purposes for which they are used and would not pass inspection as conforming goods within the trade because at the time they left the control of Nissan, and at the time of sale, they had defective paint which has the propensity to peel, discolor, and delaminate and corrode within an unreasonably short period of time during the vehicle's lifetime.

66.     Defendants' breach of warranty deprived Plaintiff and the other Class and Subclass members of the benefit of their bargain because the attractive appearance and high-

quality, durable paint job on the Class and Subclass Vehicles for the entire lifetime of the vehicle was material to their decision to purchase the vehicle. The vehicles effectively ceased being the cars they purchased, given the substantial and material alterations to the vehicles' appearance caused by the paint defect.

67.    As a proximate and foreseeable result of Defendants' breach, Plaintiff and the other members of the Class and Subclass have and or/will sustain damages and loss. These damages include, but are not limited to: the loss of value of the vehicle as a result of the paint defect, including peeling, fading, discoloration, and/or delamination; expectation damages for Plaintiff and the Class and Subclass members because they did not obtain the benefit of the bargain they struck with Defendants; and any further damages that Plaintiff and the other Class and Subclass members have or will incur in order to remedy the defective paint, rust and corrosion problems with their Class and Subclass Vehicles.

<u>**COUNT III**</u>
**Breach of Contract against Defendant Infinti of Lisle, Inc.**
**(on behalf of Plaintiff and the proposed Subclass)**

68.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.    Plaintiff, like the other Subclass members, entered into a contract with Defendant Dealership to purchase a Subclass Vehicle.

70.    Pursuant to this contract Plaintiff and the other Subclass members paid the Dealership significant consideration in the amount of the purchase price of the vehicle. In exchange, Dealership was to sell Plaintiff and the other Subclass members the chosen Subclass Vehicle in new condition, or in the condition that was represented to the Subclass members.

71.    However, a vehicle that is sold with a defect in its paint, body, and/or workmanship that causes its paint to routinely fade, peel and delaminate, or otherwise discolor within the foreseeable ownership lifetime of the vehicle, is not in "new" condition and is not in the condition that Plaintiff and the Subclass members thought they were purchasing.

72.    Accordingly, the Dealership has materially breached its contractual obligations to Plaintiff and the other Subclass members by delivering vehicles with a paint defect that caused the paint on the vehicles to peel, fade, discolor, and/or delaminate.

73.    As a proximate and foreseeable result of the Dealership's breach and sale of vehicles with the described paint defect, Plaintiff and the other members of the Subclass have already, or will in the future, sustain damages and losses.  These damages include, but are not limited to: the loss of value of the vehicle as a result of the paint defect, including peeling, fading, discoloration, and/or delamination; expectation damages for Plaintiff and the other Subclass members because they did not obtain the benefit of the bargain they struck with Dealership; and damages that Plaintiff and the other Subclass members will have to incur in order to remedy the defective paint, rust and corrosion problems with their vehicles.

### COUNT IV
**Violation of the Illinois Consumer Fraud
and Deceptive Business Practices Act, 815 ILCS 505/2
against Defendants Nissan and Dealership
(on behalf of Plaintiff and the proposed Class and Subclass)**

74.    Plaintiff incorporates by reference all of the foregoing allegations as if fully set forth herein.

75.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

76.     Plaintiff and the other members of the Class and Subclass are "consumers" within the meaning of Section 1(e) the ICFA.

77.     Defendants' conduct as alleged herein occurred in the course of trade or commerce.

78.     Nissan directed advertisements to Illinois consumers by placing print and TV ads for its Infiniti brand vehicles.

79.     These advertisements misrepresented the quality of its Infiniti brand vehicles.

80.     Defendants manufactured, marketed, and sold vehicles purchased by Plaintiff and the other members of the Class and Subclass that contained a latent defect or defects in the paint which caused the paint to peel, discolor, fade and/or delaminate unreasonably soon after their purchase of the vehicle.

81.     Defendants failed to inform Plaintiff and the other members of the Class and Subclass that the vehicles they were purchasing suffered from this paint defect and were not "new" and/or merchantable as was affirmatively represented to them.

82.     Defendants had superior knowledge of the paint defects, given that Defendants designed and applied the paint to the vehicles and manufactured, distributed, and sold the vehicles to consumers, and given that Defendants were aware of a significant number of

customer complaints over an extended period of time regarding the paint defect, including complaints from prior to the sale of the Infiniti vehicle to Plaintiff. As such, Defendants had a duty to disclose to Plaintiff and the Class and Subclass members any material information involving the existence and extent of the paint defects.

83.    However, Defendants intentionally concealed, misrepresented and/or omitted material facts from Plaintiff and the Class and Subclass members about the defect in the paint on their Infiniti vehicles in an effort to induce Plaintiff and the Class and Subclass members to purchase the Infiniti vehicles and to purchase them at a higher price than Plaintiff and the Class and Subclass members would have otherwise paid had the defect been properly and appropriately disclosed.

84.    Even upon being specifically informed about the scope and extent of the paint defect problem, Defendants failed to do anything to remedy the situation, or offer any sort of compensation to owners of the affected Infiniti vehicles.

85.    By engaging in the above deceptive and unfair trade practices, Defendants have violated section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.

86.    As a direct and proximate cause of Defendants' deceptive and unfair trade practices, Plaintiff and the other members of the Class and Subclass suffered actual damages, including monetary losses associated with the decreased value of their vehicles, the cost of having to repair or replace the paint on their vehicles, and expectation damages associated with not receiving the benefit of the bargain, as the quality and durability of the vehicles' paint was material to their decision to purchase the vehicle.

87.     Defendants' conduct is in violation of the ICFA, and pursuant to 815 ILCS 505/10a, Plaintiff and the other members of the Class and Subclass are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees, injunctive relief prohibiting Defendants' unfair and deceptive conduct going forward, and any other penalties or awards that may be appropriate under applicable law.

WHEREFORE, for the reasons set forth above, Plaintiff requests relief and judgment against Defendants as follows:

a.      An Order certifying the Class and Subclass as defined above;

b.      An award of actual and compensatory damages to Plaintiff and the other members of the Class and Subclass for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

c.      Imposing a constructive trust against Defendants for the benefit of Plaintiff and members of the Class;

d.      Enjoining Defendants from continuing to sell vehicles with defective paint;

e.      An award of reasonable attorneys' fees and costs; and

f.      Such further and other relief as the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all claims and issues so triable.

Dated:  August 9, 2017                              Respectfully submitted,

JOHN ANGLIN, individually
and on behalf of all others similarly situated

By:     s/ David L. Gerbie

Myles McGuire
Eugene Y. Turin
David L. Gerbie
MCGUIRE LAW, P.C.
55 West Wacker Drive, Suite 900
Chicago, Illinois 60601
mmcguire@mcgpc.com
eturin@mcgpc.com
dgerbie@mcgpc.com
Tel: (312) 893-7002

Scott A. Morgan
MORGAN LAW FIRM, LTD.
55 West Wacker Drive, Suite 900
Chicago, Illinois 60601
smorgan@smorgan-law.com
Tel: (312) 327-3386

John Sawin
SAWIN LAW FIRM, LTD.
55 West Wacker Drive, Suite 900
Chicago, Illinois 60601
jsawin@sawinlawyers.com
Tel: (312) 853-2490

*Attorneys for Plaintiff and the proposed Class*